# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

UNITED STATES OF AMERICA,

                Plaintiff,

  v.

$27,980.00 IN UNITED STATES CURRENCY,

                Defendant.

Case No. 3:11-cv-00109-SLG

## **DECISION & ORDER**

Before the Court at Docket 1 is the Verified Complaint for Forfeiture filed on May 18, 2011. James Porter filed a Claim and an Answer on June 9, 2011.[1] On September 20, 2012, a Default Judgment was entered "against all those persons and entities, besides James Porter, who could potentially claim an interest in the defendant property."[2]

An Evidentiary Hearing on Mr. Porter's claim was held on May 30, 2013 and May 31, 2013 in Ketchikan, Alaska.[3] At the conclusion of the hearing, the Court left the record open to permit the submission of certain bank statements and urinalysis testing results.[4] Thereafter, Mr. Porter filed a number of his bank statements.[5] Although

---

[1] Docket 5 (Porter Claim); Docket 6 (Porter Answer).

[2] Docket 19 at 2 (Default Judgment). In Kenda Kline's Unopposed Second Motion to Intervene, she indicates that the Government agreed that this default judgment "does not pertain to Kline's interest in this cause." Docket 58 at 2 (Mot. to Intervene).

[3] Dockets 76–78 (Hr'g Tr.).

[4] Docket 78 at 130–32 (Hr'g Tr.).

[5] Dockets 46–48 (Notices of Filing of Bank Statements).

accorded several extensions,[6] Mr. Porter did not file the results of any urinalysis testing. By Order dated November 25, 2013, the Court ordered the record closed.[7]

Meanwhile, in July 2013, Kenda Kline filed an unopposed motion to intervene, which was granted by Order dated August 1, 2013.[8] On August 7, 2013, Ms. Kline filed her Answer and Claim.[9]

Based on the foregoing, the testimony and exhibits before the Court, and the arguments of counsel, the Court now makes the following:

## **FINDINGS OF FACT**

1. The sole basis for Kenda Kline's claim to the proceeds in this matter arises from child support arrears due from Mr. Porter to Ms. Kline.

2. An outstanding Judgment for Child Support Arrears was issued by the Superior Court for the State of Alaska, First Judicial District at Ketchikan, dated October 12, 2011 in the amount of $95,391.75. Ms. Kline is the judgment creditor; Mr. Porter is the judgment debtor.[10]

3. Ms. Kline asserts that the child support arrears totaled $95,391.75 in August 2006.[11] At that time, Mr. Porter and Ms. Kline entered into an agreement in which Mr. Porter would receive an in-kind credit for the full amount of arrears due

---

[6] Dockets 51, 71, 73 (Orders Granting Extensions).

[7] Docket 74 (Order Closing Record).

[8] Docket 61 (Order Granting Mot. to Intervene).

[9] Docket 64 (Kline Answer); Docket 65 (Kline Claim).

[10] Docket 65 at 1 (Kline Claim); Docket 66-1 (Judgment for Child Support Arrears).

[11] Docket 58-4 at 1 (Kline Decl.).

through the "transfer [of] two limited entry permits to [Ms. Kline] in lieu of paying the child support arrears of $95,391.75."[12]

4. The Child Support Services Division (CSSD) approved the in-kind credit agreement. Ms. Kline submitted a declaration in this proceeding in which she stated that in light of that agreement, she believes that CSSD "released the liens asserted against [Mr. Porter]."[13]

5. Mr. Porter never transferred the limited entry permits to Ms. Kline. As of April 23, 2012, he had not made any payments on the child support judgment.[14]

6. Ms. Kline asserts that she has priority over the United States to the seized funds because "the accrual of child support arrears [was] prior to the seizure date of April 12, 2011."[15]

7. Ms. Kline was an unsecured creditor of Mr. Porter at the time the funds at issue in this case were seized from Mr. Porter.

8. The Defendant Currency was seized by the Alaska State Troopers on April 11, 2011 from James Porter, incident to Mr. Porter's arrest in Ketchikan, Alaska for outstanding State of Alaska arrest warrants.

9. Most of the seized funds (over $20,000) were found in Mr. Porter's pocket. They were wrapped very tightly together with black electrical tape, with the letters "JP"

---

[12] Docket 58-4 at 1 (Kline Decl.).

[13] Docket 58-4 at 2 (Kline Decl.).

[14] Docket 58-7 at 1 (Writ of Execution).

[15] Docket 58 at 4 (Mot. to Intervene). The motion incorrectly notes the seizure date as April 12, 2011 instead of April 11, 2011.

written in white tape on the outside of the package. The electrical tape was quite clean and lint-free – including the white letter "P" that was visible on Exhibit 2. This means it is likely that the funds had been recently placed into the taped package. The remaining funds (over $3,800) were found in Mr. Porter's wallet.[16]

10. Counsel for Mr. Porter suggested the funds had been packaged in the electrical tape because Mr. Porter was a fugitive at that time. However, there was no testimony in the record to directly support that inference.

11. Mr. Porter's tax returns demonstrate the following total income: 2008 -- $110,299; 2009 -- $53,446; 2010 -- $58,445 (Exhibits 10–12). Mr. Porter's primary employment with Dawson Construction ended sometime in approximately November 2010, and he had not worked after that time up to the date of the seizure.[17]

12. The bank records submitted by Mr. Porter after the evidentiary hearing show the following transactions over $1,000 beginning in November 2010 through April 2011 (transactions for smaller amounts are not listed)[18]:

| Tongass Federal Credit Union | | | |
| --- | --- | --- | --- |
| Date | Account Balance | Deposits | Withdrawals |
| November 2, 2010 | $21,026.73 | | |
| December 7, 2010 | | | $5,000 |
| December 17, 2010 | | $1,450 | |
| December 21, 2010 | | | $3,500 |

---

[16] Docket 78 at 94 (Hr'g Tr.).

[17] Docket 78 at 32 (Hr'g Tr.) (discussing 4/11/11 interview).

[18] Dockets 46–48 (Notices of Filing of Bank Statements). The Government was accorded the option to request a supplemental evidentiary hearing with respect to those records, but did not do so. *See* Docket 78 at 132 (Hr'g Tr.).

| Date | Account Balance | Deposits | Withdrawals |
|---|---|---|---|
| January 7, 2011 | | | $5,002 |
| January 13, 2011 | | | $5,000 |
| March 28, 2011 | | $1,000 | |
| April 30, 2011 | $5,098.04 | | |

| First Bank Checking Account | | | |
|---|---|---|---|
| Date | Account Balance | Deposits | Withdrawals |
| November 16, 2010 | $797.02 | | |
| November 17, 2010 | | $9,400 | |
| December 7, 2010 | | $2,295.56 | |
| December 13, 2010 | | | $2,021.63 |
| January 3, 2011 | | | $1,639.55 |
| January 5, 2011 | | | $3,436.35 |
| February 28, 2011 | | $2,000 | |
| March 4, 2011 | | $1,250 | |
| March 8, 2011 | | $2,000 | |
| March 22, 2011 | | $1,000 | |
| March 28, 2011 | | $1,200 | |
| March 28, 2011 | | $2,000 | |
| March 30, 2011 | | | $1,188.80 |
| April 15, 2011 | $3,393.61 | | |

| First Bank Savings Account | | | |
|---|---|---|---|
| Date | Account Balance | Deposits | Withdrawals |
| November 16, 2010 | $3,537.42 | | |
| February 2, 2011 | | | $1,000 |
| April 19, 2011 | | | $500 |
| May 15, 2011 | $2,040.41 | | |

| First Bank Joint Account with Mary Schmidt | | | |
|---|---|---|---|
| Date | Account Balance | Deposits | Withdrawals |
| November 16, 2010 | $153.82 | | |
| November 17, 2010 | | $12,659.64 | |
| December 7, 2010 | | $1,000 | |
| December 8, 2010 | | | $6,400.07 |
| December 9, 2010 | | | $1,107.04 |
| December 29, 2010 | | $1,000 | |
| January 18, 2011 | | $2,042.92 | |

| | | | |
|---|---|---|---|
| February 1, 2011 | | | $1,405.30 |
| March 8, 2011 | | $1,000 | |
| April 19, 2011 | | | $1,960 |
| May 15, 2011 | $2.47 | | |

13. These bank records demonstrate that a considerable amount of funds were deposited into Mr. Porter's accounts during the time that he was unemployed from December 2010 through April 2011. At the evidentiary hearing, Mr. Porter testified that the seized funds "was money I had in my pocket for quite some time." He added, "I could show large cash withdrawals from my bank accounts from First Bank and the credit union."[19]

14. The withdrawals that were taken from Mr. Porter's accounts in December 2010 and January 2011 could, standing alone, support Mr. Porter's position that the seized funds came from his bank accounts and were perhaps from his former employment or other legal activities. But the subsequent deposits, each $2,000 or less, but together totaling over $10,000 between February 28 and March 28, 2011, are persuasive evidence that Mr. Porter, who was then unemployed, was then generating significant income from an unspecified source.[20]

---

[19] Docket 78 at 26 (Hr'g Tr.).

[20] Although Mr. Porter indicated he had sold copper to generate income on occasion, the Court was persuaded by his statements at his interview with Investigator Brown on April 11, 2011 that he was driving around with the copper in his truck at that time and had not yet sold it. And while there was various testimony regarding vehicle sales at various times, those sales primarily occurred in the summer of 2010. No persuasive evidence of vehicle sales in early 2011 was presented to explain the substantial cash deposits at that time.

3:11-cv-00109-SLG, *United States v. $27,980*
Decision & Order
Page 6 of 12

15. Special Agent Rambo persuasively testified that drug traffickers try to avoid conspicuous large cash deposits with banks or other financial institutions.[21] Mr. Porter's smaller but frequent deposits in March 2011 are consistent with this pattern.

16. Included within the money inside the electrical tape were two deposit slips dated March 28, 2011 that correspond to two of the deposits that were made into Mr. Porter's accounts on that day (Exhibits 5 & 6). This evidence supports a finding that the funds in the electrical tape package were earnings from that same time frame.

17. Special Agent Rambo also persuasively testified that the way the currency was tightly packaged inside the electrical tape was consistent with proceeds of drug trafficking.[22]

18. John Brown, the investigator with the Alaska State Troopers who spoke to Mr. Porter on April 11, 2011 when the funds were seized, persuasively testified that he told Mr. Porter he could return with paperwork to support his claims that the funds were legitimately earned, but that Mr. Porter never did.[23]

19. The Government called Howard Falkner as a witness at the evidentiary hearing. Mr. Falkner testified that he knew Mr. Porter from dealing drugs in Ketchikan. Mr. Falkner testified from prison and indicated that he was incarcerated for dealing methamphetamine. Although Mr. Falkner's testimony has been viewed

---

[21] Docket 78 at 47 (Hr'g Tr.).

[22] Docket 78 at 49–50 (Hr'g Tr.).

[23] Docket 78 at 108–09 (Hr'g Tr.).

by the Court with suspicion, given his criminal history and cooperation arrangements with prosecuting authorities, the Court accorded some weight to his testimony that he purchased methamphetamine from Mr. Porter on at least two occasions in early to middle 2011, particularly as he specified a location of the transactions that was consistent with other evidence in the record.[24]

20. Stevie Lea Hyke, the spouse of Mr. Falkner, also testified. She persuasively testified about observing methamphetamine sales by Mr. Porter in December 2010, including observing Mr. Porter acquiring large amounts of cash ($6,000) from those drug sales.

21. Rayme Vinson, a drug investigator and drug canine handler, testified at the evidentiary hearing. He persuasively testified as to how the canine, Justice, from Juneau, was trained to detect the smell of certain illegal drugs, and alerted to the presence of such drugs at the piles of money that had been seized from Mr. Porter on April 11, 2011.[25]

22. K.C. testified under seal. This witness was understandably quite emotionally distraught. Perhaps because of that high level emotion, the dates this witness provided were inconsistent with the dates provided by other witnesses for certain actions. Accordingly, this Court did not accord weight to K.C.'s testimony.

---

[24] Docket 76 at 14–21 (Hr'g Tr.).

[25] There was also evidence that another drug dog from Ketchikan had first sniffed at the money and did not alert. This Court accorded no weight to this fact, as it was persuaded by the testimony that this dog was inexperienced and money can be challenging to smell, since it often has been handled so much.

23. Mr. Porter called several witness to testify at the evidentiary hearing.[26] However, their testimony was based on their interactions with Mr. Porter when he was at Metlakatla. Since the Court finds that Mr. Porter left Metlakatla in approximately November 2010, these witnesses were not able to provide helpful evidence as to Mr. Porter's activities after that time.

## **CONCLUSIONS OF LAW**

1. This is a civil forfeiture action brought pursuant to 21 U.S.C. § 881(a)(6).

2. The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

3. An unsecured creditor of a claimant lacks standing to challenge the forfeiture of funds seized pursuant to 18 U.S.C. § 881(a)(6). *See United States v. $38,852.00 in U.S. Currency*, 328 F. Supp. 2d 768, 769 (N.D. Ohio 2004).

4. In a civil forfeiture action, the claimant to the property must have standing in order to challenge the forfeiture. *Untied States v. Carrell*, 252 F.3d 1193, 1196 n.2 (11th Cir. 2001) (creditor with child support judgment against claimant could not enforce judgment against seized proceeds in forfeiture proceeding because as non-owner of property, she lacked standing).

5. A civil forfeiture claimant demonstrates Article III standing by showing she has a "colorable interest in the property, which includes an ownership interest or a possessory interest" in the specific seized property. *United States v. $133,420 in U.S. Currency,* 672 F.3d 629, 637–38 (9th Cir.2012) (citation omitted) (internal

---

[26] These witnesses included Trinity Carroll Jackson, Christopher Dowling, and Timothy Kuharich.

quotation marks omitted). General unsecured creditors of the person whose property was seized lack a sufficient property interest to have standing to challenge the government's civil forfeiture. *See* 18 U.S.C. § 983(d)(6)(B)(i) (excluding "a person with only a general unsecured interest in, or claim against, the property or estate of another" from the definition of "owner"); *see also United States v. One Hundred Thirty-Three (133) U.S. Postal Serv. Money Orders Totaling $127,479.24 in U.S. Currency*, 496 Fed. App'x 723, 724 (9th Cir. 2012); *United States v. $20,193.39 U.S. Currency,* 16 F.3d 344, 346 (9th Cir.1994) ("[U]nsecured creditors do not have standing to challenge the civil forfeiture of their debtors' property.").

6. Based on the foregoing, Kenda Kline lacks standing to challenge the government's civil forfeiture of the funds seized from Mr. Porter in this action because she was an unsecured creditor at the time the property was seized. Accordingly, her claim will be denied.

7. Turning to Mr. Porter's claim, the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture. *See* 18 U.S.C. § 983(c)(1).

8. Here, the Government's alternative theories of forfeiture are that the seized currency was either the proceeds of drug trafficking, or that the seized currency was used or intended to be used to commit or facilitate the commission of illegal drug trafficking.[27] Under the second theory, the Government must establish by a preponderance of the evidence that there was a substantial connection between

---

[27] Docket 78 at 137–38 (Hr'g Tr.).

the seized currency and illegal drug activity. *See* 18 U.S.C. § 983(c); 21 U.S.C. § 881(a)(6); *see also United States v. $22,474.00 in U.S. Currency,* 246 F.3d 1212, 1217 (9th Cir. 2001) ("[Appellant's] inconsistent statements about the money and his reasons for being in Phoenix tend[] to support an inference that the money was drug-related."); *United States v. $29,959.00 U.S. Currency,* 931 F.2d 549, 553 (9th Cir. 1991) (having large amount of cash is "strong evidence" of connection to illegal drug activity); *United States v. $215,300 U.S. Currency,* 882 F.2d 417, 419 (9th Cir.1989) (concealing and lying about a large amount of money supports inference that money is related to narcotics trafficking).

9.  The evidence demonstrated that over the years, Mr. Porter has earned a considerable amount of income through legal means and has paid taxes on that income. However, while Mr. Porter attempted to show legitimate sources for the seized money, he failed to present a cogent and consistent explanation for its origin. Also, there was no witness who testified that they had seen Mr. Porter carry legitimately-earned currency in the manner in which much of this currency was found – tightly wrapped in electrical tape with his initials on it.

10. The quantity of currency, the packaging, the lack of a clear and verifiable explanation for the currency's source or use, and the positive alert by the Juneau canine together constitute persuasive evidence that the seized funds were used or intended to be used to commit or facilitate the commission of drug trafficking activity. *See generally United States v. Currency, U.S. $42,500*, 283 F.3d 977 (9th Cir. 2002).

11. Based upon the findings of fact set forth above, the Court concludes that the government has established by a preponderance of the evidence that the seized currency was used or intended to be used to commit or facilitate the commission of illegal drug trafficking. In this regard, the Court finds by a preponderance of the evidence that there was a substantial connection between the seized currency and illegal drug activity.

## ORDER

Based on the foregoing, IT IS ORDERED:

1. The claim of Kenda Kline to the seized funds is DENIED.

2. The claim of James Porter to the seized funds is DENIED.

3. The United States' Complaint for civil forfeiture is GRANTED.

4. The United States is entitled to a judgment declaring the $27,980.00 forfeited to the United States for disposition according to the law.

5. The United States shall submit a proposed judgment consistent with this Decision and Order within 7 days.

DATED at Anchorage, Alaska this 13th day of June, 2014.

                                              */s/ Sharon L. Gleason*
                                              UNITED STATES DISTRICT JUDGE

3:11-cv-00109-SLG, *United States v. $27,980*
Decision & Order
Page 12 of 12